## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**FRANK THOMAS CARTER,**

**Plaintiff,**

      **vs.**                    **Case No.   5:13cv304/MP/MD**

**CAROLYN W. COLVIN,**
**Action Commissioner of the**
**Social Security Administration,**

**Defendant.**

_____/

### REPORT and RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Carter's application for Supplemental Security Income benefits under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

## PROCEDURAL HISTORY

Mr. Carter filed an application for benefits claiming an onset of disability as of December 21, 2007, later amended to June 15, 2010.  The application was denied initially and on reconsideration, and claimant requested a hearing before an administrative law judge (ALJ).  A hearing was held on November 18, 2011 at which Mr. Carter was represented by counsel and testified.  A vocational expert also testified.  The ALJ entered an unfavorable decision (Tr. 20-30) and Mr. Carter requested review by the Appeals Council without submitting additional evidence. The Appeals Council declined review (Tr. 1-6).  The Commissioner has therefore made a final decision, and the matter is subject to review in this court.  *Ingram v. Comm'r of Soc. Sec. Admin*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This timely appeal followed.


## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Mr. Carter had severe impairments of depression, anxiety and personality disorder,[1] but that he did not have an impairment or combination of impairments that met or medically equaled one of the listings in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, 416.926); that he had no past relevant work; that he was a younger individual (age 36) with a high school education with ability to communicate in English; that he had the residual functional capacity to perform light work with some restrictions; and that in light of his age, education, work experience and residual functional capacity, there are jobs that exist in the national economy that he can perform.

---

[1] Mr. Carter also has several physical severe disabilities, but he has not raised any issue with respect to these matters in this appeal.  Any claim concerning physical disability is therefore waived.  *See Sepulveda v. U. S. Atty. Gen.*, 401 F.3d 1226, 1228 n. 2 (11th Cir. 2005) (arguments not raised in an opening brief are waived).

# STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure either to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).  Even if the proof preponderates against the Commissioner's decision, it must be affirmed if supported by substantial evidence.  *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *Moore*, 405 F.3d at 1211 (citation omitted).  In determining whether substantial evidence exists, the court  must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence.  *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  Findings of fact of the Commissioner that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Social Security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits.  *See Moore,* 405 F.3d at 1211;  20 C.F.R. § 416.920 (2009) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2009) (five-step determination for DIB).  A finding of disability or no disability at any step renders further evaluation unnecessary.  *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  The steps are:

1.  Is the claimant currently engaged in substantial gainful activity?

2.  Does the claimant have any severe physical or mental impairment that meets the duration requirement?

3.  Does the claimant have any severe impairments that meet or equal those listed in Appendix 1 to subpart P of 20 C.F.R. Part 404 and meet the duration requirement?

4.  Considering the claimant's residual functional capacity, can the claimant perform past relevant work?

5.  Can the claimant perform other work given the claimant's residual functional capacity, age, education and work experience?

*Id.*

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore,* 405 F.3d at 1211 (citing *Spencer v. Heckler,* 765 F.2d 1090, 1093 (11th

Cir.1985)).  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987).  If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner.  *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

On October 15, 1987, fourteen year old Frank Thomas Carter, plaintiff here, was hospitalized at The Psychiatric Institute of Washington , D.C. The only treatment document of record is an interview by the examining social worker, Ms. Bryan. (R. 203-06).  This interview reflects that Mr. Carter had a history of "severe learning disabilities, developmental delays and school problems."  (R. 203, 205).   The hospitalization was precipitated by "increasing anxiety attacks, school refusal, separation anxiety, anger episodes, and fire setting episodes." (R. 203).  Mr. Carter was reportedly frustrated with his placement in special education in the public school system.  He had been placed at a specialized boarding school for learning disabled children, but the placement was unsuccessful. A specialized, therapeutic school was recommended as a result. (R. 203-04). Mr. Carter also previously repeated a grade (R. 205).   In addition to a fascination with fire and difficulty controlling anger, Mr. Carter had "a long history for telling tall tales and has a vivid imagination" and "likes very much to go with his father places on the weekend." (R. 204, 206). The discharge recommendation was for a "highly structured residential treatment center which could also address [Mr. Carter's] severe learning disability and developmental delays . . . following a complete psychiatric and educational evaluation." (R. 206).

Mr. Carter attended Accosting Academy in Springfield, Virginia (a therapeutic day school) for four years and graduated in 1992 (R. 201).  In conjunction with Mr. Carter's upcoming graduation, in February 1992 treating psychologist Ira Abrams, Ph.D. provided a report to Mr. Carter's teacher.  Dr. Abrams noted Mr. Carter's history of psychiatric hospitalization with subsequent maintenance on Lithium with counseling until he started attending Accosting in 1989.  Dr. Abrams noted Mr. Carter was seen for counseling, and over the course of the academic year,  Mr. Carter's "[exaggerating] and fabricating stories to impress his counselor has diminished" and he was continuing to work on his mood changes. Dr. Abrams recommended that after graduation, Mr. Carter "seek structured social and work activities to maintain interactions with peers. Continuation of counseling is suggested if [Mr. Carter] becomes increasingly] anxious or depressed." (R. 207).

On July 8, 2010, in conjunction with his application for disability benefits, Mr. Carter reportedly informed Ms. Foster, a State agency employee, that he was not taking "mental medication" at that time but was in weekly counseling, had never been involuntarily committed to a mental institution, his "mental conditions don't particularly interfere with his ability to work" and he was planning on enrolling in college level "refresher" courses (R. 198).

On August 5, 2010, Mr. Carter was evaluated by Julian Salinas, Ph.D. at the Commissioner's request.  The only records provided to Dr. Salinas prior to his evaluation were notes from Ms. Foster (R. 351).  Dr. Salinas noted difficulty in the clinical interview, with Mr. Carter interrupting Dr. Salinas with a request that the examination report be forwarded to his treatment provider at Life Management.  In addition, Dr. Salinas noted,

> Upon resumption of the orientation and during discussion of his childhood development, Mr. Carter continued interrupting with topics unrelated to the matter at hand, (e.g. his diagnostic history and his psychiatric treatment history, eventually stating 'I don't see how this is pertinent to matters of my disability.' His approach remained similarly guarded throughout the interview, with his frequent references to

**multiple professionals he has been treated by and attempts to derail the content of the interview. At times, he refused to discuss certain topics, (e.g. his brother's suicide, his hospitalization, and his putative bipolar symptoms.) In addition to this guarded and subtly hostile interpersonal approach, Mr. Carter made use of over-formalized language, and at times laughed , indicating both anxiety and a marked interpersonal ambivalence between warmth and cold guardedness.**

(R. 353).

Mr. Carter informed Dr. Salinas that he never repeated a grade, started special education in the tenth grade, received a regular diploma, and was enrolled in college classes. He reported taking no psychotropic medications at the time of the examination, but was hospitalized for psychiatric reasons at age 12 or 13.  In addition to refusing to discuss the hospitalization, Mr. Carter also stated that he experienced anxiety and had been told he was diagnosed with bipolar and multiple split personality disorder, but refused to discuss his symptoms (R. 352).

Dr. Salinas diagnosed Dysthymic Disorder; Anxiety Disorder NOS; and Personality Disorder NOS with obsessive-compulsive and narcissistic features. In his conclusion, Dr. Salinas noted Mr. Carter's reports that he never lived independently and never held a job for a significant period of time.  Dr. Salinas opined that Mr. Carter's "interpersonal approach during a clinical interview was guarded, overformalized, and ambivalent" and that Mr. Carter "reports multiple difficulties consistent with a chronic and mild to moderate depressive disorder, with more acute anxiety difficulties that have both posttraumatic and generalized features."  Dr. Salinas also noted "relatively long-standing maladaptive personality characteristics that likely impede in his social functioning.  As such, psychological difficulties appear to be associated with moderate deficits in his daily social functioning" although Mr. Carter's cognitive functioning was intact. (R. 354).

On September 18, 2010, Mr. Carter returned to Life Management for a psychiatric evaluation due to anxiety, depression, and insomnia.  He had received services at Life Management, but had stopped following up two years prior when his

psychiatrist left. However, he was receiving ongoing psychotherapy with David Smith, Ph.D., also of Life Management.  Psychiatrist Omar Howard, M.D. diagnosed Unspecified Personality Disorder, NOS, and Depressive Disorder, NOS, for which Celexa, Vistaril, and Trazodone were prescribed. (R. 373-75).

On November 30, 2010, Mr. Carter first received treatment with psychiatrist Gary Gorman, M.D.  Mr. Carter reported he continued to receive psychotherapy with Dr. Smith. (R. 416).  Dr. Gorman diagnosed Depressive Disorder, NOS and rule out Bipolar Disorder Type II, but deferred a determination regarding personality disorders (Axis II).  Celexa and Trazodone were prescribed. (R. 417).

In February 2011, Mr. Carter reported "feeling well" but he was having "legal problems" and spent a day in jail. (R. 424).  Dr. Gorman continued to provide treatment through August 16, 2011, changing Mr. Carter's prescriptions to a combination of Celexa and Abilify. (R. 422-24).

On November 1, 2011, Dr. Smith, the Life Management psychologist who had been treating Mr. Carter regularly for more than a year and had seen him over a period of at least fourteen years, provided a Treatment Summary and several completed assessment forms. (R. 426-36).  In the Summary, Dr. Smith stated he had provided more than 100 psychotherapy sessions for Mr. Carter since 1997, and saw Mr. Carter weekly for treatment.  Dr Smith explained that Mr. Carter "has experienced mental health problems since childhood" and received intermittent psychiatric treatment at Life Management.  At that time, he continued to take Celexa and Abilify as prescribed by Dr. Gorman. (R. 426).  Dr. Smith summarized Mr. Carter's condition as follows:

> Mr. Carter has evidenced numerous mental health problems since he initiated psychotherapy with me 14 years ago. He has displayed generalized anxiety, PTSD symptoms, and panic attacks.  These symptoms are currently in partial remission.  He has also evidenced persistent depressive symptomatology including depressed mood, periods of agitation, poor concentration, reduced energy, amotivation, and feelings of uselessness. Chronic pain has caused an exacerbation of depressive symptomatology.  Moreover, maladaptive personality

traits have been severe and persistent. His identity disturbance is pronounced. He has an unstable self-image. He said, "I don't know who I am. I mold myself to what I want people to see." He has also displayed distinct personality states. He explained, "I've created different personalities to help me cope and function." Symptoms of his personality disorder also include affective instability, pent-up anger, feelings of emptiness, problems with trust, and fears of abandonment. He doe not have a substance use disorder. Mr. Carter is motivated to change; he is invested in psychotherapy. However, his maladaptive personality traits have endured and continue to cause significant social and occupational problems.

(R. 426-27). Dr. Smith noted Mr. Carter's diagnoses of Dysthymic Disorder; Anxiety Disorder NOS (in partial remission); and Personality Disorder NOS (borderline traits). (R. 427).

Dr. Smith completed a Medical Opinion Form on the same date as the Treatment Summary. He opined that Mr. Carter would be "unable to meet competitive standards" in the following mental abilities: 1) work in coordination with or proximity to others without being unduly distracted; 2) complete a normal workday and workweek without interruptions from psychologically based symptoms; 3) accept instructions and respond appropriately to criticism from supervisors; 4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; 5) interact appropriately with the general public; 6) maintain socially appropriate behavior; 7) set realistic goals or make plans independently of others; 8) carry out detailed instructions; and 9) deal with stress of semiskilled and skilled work (R. 428-29).

Dr. Smith opined that Mr. Carter would be "seriously limited, but not precluded" in the following mental abilities: 1) maintain regular attendance and be punctual within customary, usually strict tolerances; 2) sustain an ordinary routine without special supervision; 3) perform at a consistent pace without an unreasonable number and length of rest periods; 4) deal with normal work stress; and 5) carry out detailed instructions (R. 428-29). Dr. Smith opined Mr. Carter would

likely be absent from work more than four days a month, and that the limitations stated were in accordance with the Treatment Summary and that Mr. Carter's "personality disorder is a significant occupational impediment." (R. 428).

Dr. Smith also completed three questionnaires on personality, affective, and anxiety related disorders (R. 430-36). On the form titled "12.08: Personality Disorders," Dr. Smith marked the form to indicate Mr. Carter's exhibited symptoms consistent with the 12.08(A)(3), (4), and (6) criteria and the (B)(1)(3) criteria (R. 430-31). On the form titled "12.04: Affective Disorders," Dr. Smith marked the form to indicate the presence of a depressive disorder with symptoms of sleep disorder and decreased energy consistent with the 12.04(A)(1)(c) and (e) criteria, and resulting in marked difficulties in maintaining social functioning consistent with the 12.04(B)(2) criterion. He also noted that Mr. Carter had a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement, consistent with the 12.04(C)(3) criterion (R. 432-33). Finally, on the form titled "12.06: Anxiety Related Disorders," Dr. Smith indicated the presence of generalized persistent anxiety with apprehensive expectation consistent with the 12.06(A)(1)(c) criterion , but noted the anxiety disorder resulted in no limitations and was in partial remission with medication and counseling (R. 435-36).

During the administrative process, Mr. Carter's records were reviewed by two non-examining State Agency psychologists. The first, on September 2, 2010, opined that Mr. Carter did not have a severe mental impairment (R. 356, 368). The second, on November 2, 2010, gave the same opinion (R. 387, 399).

## DISCUSSION

Mr. Carter argues that the ALJ erred in failing to accept the opinion of Dr. Smith, and that he was disabled from his onset date.[2]  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that Mr. Carter was not disabled, in light of his mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

1.      Dr. Smith's opinion.

The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling.  If a claimant meets the requirements of one of the listings, no further proof of disability is required.  *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Mr. Carter contends that his personality disorder meets the requirements of Listings 12.08 (A) and (B) and 12.04 (A) and (C).

Listing 12.08 reads, in relevant part, as follows:

12.08 *Personality disorders*: A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
1. Seclusiveness or autistic thinking; or
2. Pathologically inappropriate suspiciousness or hostility; or
3. Oddities of thought, perception, speech and behavior; or

---

[2]There is medical documentation in the record relating to Mr. Carter's physical problems, but, as noted above, he does not raise any issue here regarding physical limitations.

4. Persistent disturbances of mood or affect; or
5. Pathological dependence, passivity, or aggressivity; or
6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

And

B. And resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404 Subpart P, Appendix 1, Listing of Impairments 12.08.

**Listing 12.04 reads in relevant part as follows:**

**12.04  *Affective disorders***: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

* * *

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404 Subpart P, Appendix 1, Listing of Impairments 12.04.

The ALJ gave Dr. Smith's opinion "less then significant weight," reasoning that (1) Dr. Smith used a non-standard form which did not contain a definition of the word "marked" or set out the five point scale (none, mild, moderate, marked, extreme) used by the Social Security Administration, and it was therefore unclear whether Dr. Smith was familiar with the appropriate definitions and rating scale; and  (2) although Dr. Smith had seen Mr. Carter more then one hundred times in a clinical setting, his opinion disagreed with Mr. Carter's "other mental health treatment records."  (Tr. 28).

The ALJ erred in discounting Dr. Smith's opinion that Mr. Carter's personality disorder is a significant occupational impediment.  Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" for discounting the opinion of a treating physician exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582

(11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. 404.1527(d).

The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight.  *See* 20 CFR § 404.1527(d)(1);  *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005).   However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons."  *Phillips*, 352 F.3d at 1241.   Failure to do so is reversible error.  *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[3] *see also Nyberg v. Comm'r of Soc. Sec.*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).

The ALJ criticized Dr. Smith's opinion for several irrelevant reasons.  First, the ALJ noted that the form Dr. Smith used was non-standard, and did not

---

[3]*MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  786 F.2d at 1053.

contain a definition of "marked."  However, as Mr. Carter points out, the Commissioner's own form does not contain the definition of the word.  The Commissioner's Psychiatric Review Technique (PRT) form (Tr. 387-400) contains all possible mental conditions that a treating or examining physician should consider, including the 12.08 "A" criteria, which appear on page 8 of 14 (Tr. 394).  The form Dr. Smith signed is identical in substance, if not in form, to those pages.  It was apparently prepared by Mr. Carter's counsel, because it is in the form of a memorandum to counsel from Dr. Smith.  The wording on the 12.08 criteria on counsel's form simply restricts itself to the mental condition at issue.  For practical purposes, therefore, counsel's form signed by Dr. Smith is simply a relevantly compacted version of the Commissioner's PRT.

Moreover, although the Commissioner's form did not define "marked," the law defines the term concisely.  The introduction to the listings provides:

> [w]here we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively and on a sustained basis.

20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.00(C). Although the ALJ felt it was unclear whether Dr. Smith knew the law, that presumption was clearly erroneous.  *Jerman v. Carlisle, et. al.*, 559 U.S. 573, 581 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.' *Barlow* v. *United States*, 7 Pet. 404, 411 (1833) (opinion for the Court by Story, J.")  The clear corollary to this maxim is that the ALJ should not presume that a psychologist filling out an abbreviated version of a PRT is ignorant of the legal meaning of a common mental health term.

The ALJ also found that Dr. Smith's opinion, based on treatment in more then one hundred psychotherapy sessions, was not consistent with other mental health treatment records.  The statement clearly ignores the ALJ's burden, which is to show that the treating physician's opinion was not bolstered by the evidence or that the evidence supported a contrary finding.  *Phillips,* 357 F.3d at 1241. Ignoring the opinion of a treating physician who has seen a claimant more than one hundred times in favor of the opinions of two mental health experts, each of whom saw Mr. Carter only once, cannot reasonably be held to sustain a conclusion that contrary findings outweighed Dr. Smith's opinion.  And as outlined above, there was substantial medical evidence in the record that Mr. Carter had been receiving various forms of mental health treatment since childhood.  It was therefore error to hold that Dr. Smith's opinion was not bolstered by the evidence.  The ALJ erred in not giving Dr. Smith's opinion at least substantial weight.

It necessarily follows that because the ALJ failed properly to refute a treating physician's opinion, as a matter of law he has accepted it as true. *MacGregor*, 786 F.2d at 1053.  Dr. Smith's opinion was that Mr. Carter was "seriously limited, but not precluded" or "unable to meet competitive standards" in multiple areas of mental functioning This language mirrors the Commissioner's language defining "marked:" "to interfere seriously to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.00(C).  By failing properly to refute this opinion, th4e ALJ accepted it as true as a matter of law.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be REVERSED, judgment be entered in favor of plaintiff, that the Commissioner be ordered to compute and pay the plaintiff all benefits due, and that the clerk be directed to close the file.

**At Pensacola, Florida this 29ᵗʰ day of August, 2014.**

/S/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).